# Exhibit C



## PRODUCER AGREEMENT

This Producer Agreement (the "**Agreement**") is made effective as of August 1, 2020 (the "**Effective Date**"), by and between Banasky, an Alera Insurance Agency, LLC (including any parent, affiliate, subsidiary or successor or assign, the "**Company**"), and **Jordan Houghton** ("**Associate**").

In consideration of the promises contained in this Agreement, and Associate's employment with the Company and other valid and adequate consideration, the parties agree as follows:

1.     **Employment; Engagement**.  The Associate shall provide services to the Company as a Producer, subject to the terms and conditions of this Agreement and any Company Policy and Procedure Handbook, as one may be amended from time to time.  In the event of a conflict between the terms of the Agreement and the Policy and Procedure Handbook, if any, the terms of this Agreement shall control.

2.     **Definition of Business**.  For purposes of this Agreement, the term "Company's Business" shall include all aspects of the Company's insurance services business, investment business, consulting and/or human resources services business, and any other business in which the Company is currently or may become involved during the Term (as defined below).

3.     **Exclusive Agreement**.  Associate shall  devote Associate's full time and effort to securing and servicing business for the Company's benefit while engaged or employed by the Company.  Among other Agreement obligations imposed, Associate shall not place any business, directly or indirectly, with any person or entity other than the Company without the Company's prior written consent, nor be involved financially or otherwise with any person engaged in any aspect of the Company's Business.

4.     **General Duties**.  Associate shall solicit all business types the Company offers and shall render such services to customers as the Company deems reasonably necessary and as the Company may request and coordinate from time to time.

5.     **Compensation and Expenses**.

a.     Associate shall be paid a base salary and commissions on all net revenue received by the Company with respect to insurance produced by Associate after the Effective Date in accordance with the Compensation Schedule set forth on Appendix A (the "**Compensation Schedule**").  "Net revenue" shall mean gross commissions and fees, less commissions and fees paid to third party referral sources, but excluding any contingent payments, overrides, bonuses, incentives or other payments received by the Company from an insurer.  Net revenue shall be determined by the Company in its reasonable discretion.  Any monthly draw payments, unless otherwise agreed to in writing, shall be deemed advances against commission and fees and must be repaid out of commissions received by Associate.  Associate shall be paid a draw of 90% of annual pro forma commissions.  The draw will be reconciled once per quarter.  The reconciliation will be completed no later than 45 days following the end of the quarter.  If earned compensation exceeds the draw paid in the applicable quarter, Associate will receive the difference on the first pay date following the finalization of the reconciliation.  If paid compensation exceeds earned compensation, the Associate's next pay will be reduced by the overpayment.  The draw will be updated each quarter to reflect changes in the Associate's book of business.

{01724349-1 }



b.     The Company reserves the right to review compensation terms, including commission schedules for all employees.  New commission schedules may be periodically released by the Company, in writing, and all commission schedules shall be as the Company determines and/or changes from time to time in its discretion during the Term (as defined below) of this Agreement. Notwithstanding anything contained herein to the contrary, any subsequently released commission schedule shall be deemed to be a mutually agreed upon amendment to this Agreement.

c.     Because Associate's duties with regard to placements made hereunder may include ongoing client service and assistance with collecting payment, Associate shall not earn any commission or fee until the Company receives payment of such commission or fee from the insured, carrier or product vendor.  Commission/fee-based compensation shall be payable to Associate pursuant to the Company's procedures in effect from time to time.

d.     Upon and following Termination (as defined below) of Associate's employment with the Company for whatever reason, Associate will have earned only those commissions for business Associate obtained and serviced during the Term and for which the Company earned payment on or before the last date of the term of this Agreement.  Any commissions that have been earned by Associate on or before the Associate's date of Termination (minus any unearned draw advances or other expenses) will be paid on the later of the date of Termination or the date they are calculated (as permitted by law).

e.     Expenses may be reimbursed in accordance with Company policy and procedure.

6.     **Benefits**.  Associate may be eligible to participate in benefit programs sponsored or maintained by the Company from time to time and offered to comparable employees as determined by the Company in its discretion.  Nothing contained in the foregoing shall be construed to require the Company to maintain or sponsor any specific benefit plan or arrangement.

7.     **Term; At-Will Employment; Termination**.  The term ("**Term**") of this Agreement shall commence on the Effective Date and shall end as of the date of Termination by either the Company or Associate.  Associate's engagement or employment under this Agreement shall be on an at-will basis, terminable by either party at any time for any reason or no reason at all.  Associate's eligibility for compensation and benefits will cease on the date of Termination, except as may be otherwise provided in applicable benefit plan documents or by applicable law or regulation.  Except as otherwise provided in this Agreement, Associate's termination of employment ("**Termination**") shall terminate all obligations under this Agreement.

8.     **Duty of Associate upon Termination**.  Associate shall, immediately upon Termination for any reason, return to the Company all client records of any sort and all Company literature, supplies, letters, written or printed forms, diaries, phone lists, documents containing customer lists, customer information, product information, pricing information, information as to sources of services, financial information of the Company and memoranda pertaining to the Company's Business.

9.     **Return of Property**.  Associate shall also, immediately upon Termination, return to the Company all Company property in Associate's possession, including, telephones, tablets, computers and any other Company-issued equipment.



10. **Restrictive Covenant Agreement**. Associate will execute and agrees to abide by the terms of the restrictive covenant agreement, attached hereto at <u>Exhibit 1</u> (the "**Restrictive Covenant Agreement**").

11. **Breach by Associate; Remedies**. Associate shall perform the obligations and abide by the terms and conditions of this Agreement. Failure to do so may render Associate liable for any loss or damage the Company may suffer on account of such failure. Associate agrees that the Company may, in addition to any remedies available to it hereunder or under applicable law, specifically enforce Associate's performance or recover damages for a breach of this Agreement by civil suit, injunction or otherwise, and Associate shall be liable to the Company for the reasonable costs and attorneys' fees of any such action in which a breach is established.

12. **Acknowledgement**. Associate acknowledges that execution of this Agreement is required by the Company as a condition of becoming or remaining an Associate, as the case may be, and that this Agreement supersedes any and all prior agreements between Associate and the Company in respect of the subject matter hereof (including any similar agreement between Associate and Banasky Insurance, Inc.), whether verbal or written, expressed or implied.

13. **Assignment; Benefit**. The Company shall have the right to assign, without Associate's express consent, this Agreement to any person, including its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said person. Associate may not assign this Agreement in whole or in part without the prior written consent of the Company. Subject to the foregoing, this Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors, and assigns.

14. **Amendment and Termination**. The parties may amend or terminate this Agreement in a writing signed by both parties. This Agreement will automatically terminate upon the Company's dissolution, bankruptcy, or insolvency, or Associate's death.

15. **Governing Law/Venue/Jurisdiction/Jury Waiver**. The validity, interpretation and performance of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, without giving effect to conflict of law principles. Both parties agree that any action, demand, claim or counterclaim relating to the terms and provisions of this Agreement or to its breach, shall be commenced in the State of Illinois in a court of competent jurisdiction, and Associate hereby consents to personal jurisdiction in such court(s). Both parties further agree that any such dispute shall be tried by a judge alone, and both parties hereby waive and forever renounce the right to a trial before a civil jury in any such dispute.

16. **Severability**. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

17. **Survival**. The parties' obligations under Paragraphs 8 – 12 and 15 of this Agreement shall survive the Associate's Termination and/or termination of this Agreement.



18.     **Anti-Alienation**.  Except as to withholding of any tax under the laws of the United States or any state or locality, no payments under the Agreement shall be subject at any time or in any manner to alienation, sale, transfer, assignment, pledge, attachment, or other legal process, or encumbrance of any kind. Any attempt to alienate, sell, transfer, assign, pledge or otherwise encumber any such benefits, whether currently or thereafter payable, shall be void *ab initio*.  No person shall, in any manner, be liable for or subject to the debts or liabilities of any person entitled to such benefits. If any person shall attempt to, or shall alienate, sell, transfer, assign, pledge or otherwise encumber benefits under the Agreement, or if by any reason of the Associate's bankruptcy or other event happening at any time, such benefits would devolve upon any other person or would not be enjoyed by the person entitled thereto under the Agreement, then the Company, in its discretion, may terminate the interest in any such benefits of the person entitled thereto under the Agreement and hold or apply them to, or for, the benefit of such person entitled thereto under the Agreement or such individual's spouse, children or other dependents, or any of them, in such manner as the Company may deem proper.

19.     **Entire Agreement**.  This Agreement (including the Restrictive Covenant Agreement) represents the entire agreement between the parties regarding the terms and conditions of Associate's employment.  The terms of this Agreement may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Company or its agents.  This Agreement may not be modified except by a written agreement signed by all parties that expressly references and purports to modify this Agreement.

**[End of Text]**



IN WITNESS WHEREOF, the parties have executed this Agreement effective on the Effective Date identified above.

_____

Jordan Houghton

_____

Date   7/30/20

Banasky, an Alera Insurance Agency, LLC

By: _____

**William L. Doucette**

Its: VP Human Resources and Organization Development, Alera Group, Inc.

**Schedule A**
**Commission Schedule**

Associate shall be paid an annualized base salary of $175,000.00 per year (the "**Base Salary**"), paid biweekly in accordance with the Company's regular payroll practices while Associate is employed, and no further salary or commission or other payments will be payable to Associate with respect to existing policies for those Clients that he or she services as of the Effective Date ("**Pre-Effective Date Business**"). During the Term, the Company reserves the right to adjust the Base Salary from time to time based on changes in the net revenue associated with the Pre-Effective Date Business.

In addition, Associate will be paid commissions on all net revenue earned by the Company with respect to insurance produced by Associate for new policies with effective dates on or after August 1, 2020 in accordance with the chart below:

| Line of business | New (first 12 months) | Renewal (thereafter) |
|---|---|---|
| Employee benefits | 40% | 40% |
| Commercial P&C | 50% | 50% |
| P&C referral (benefits producer refers P&C)* | 10% | 10% |
| Servicing referred P&C account (P&C producer on account referred from EB producer) | 40% | 40% |
| Employee benefits referral (P&C producer refers employee benefits)* | 10% | 10% |
| Servicing referred EB account (EB producer on account referred from P&C producer) | 30% | 30% |

*Referral commission only payable to the extent permitted by applicable law.*



**Exhibit 1**
**Restrictive Covenant Agreement**

**Jordan Houghton** ("**Associate**") has accepted employment and/or continued employment with Banasky, an Alera Insurance Agency, LLC (including its parent and affiliates, the "**Company**") and, as a condition to such employment and Associate's access to Confidential Information of the Company, has agreed to sign this Restrictive Covenant Agreement ("**Agreement**"), effective as of August 1, 2020 (the "**Effective Date**").

1. Competitive Activity and Non-solicitation.

   a. Acknowledgements and Agreements. Associate hereby acknowledges and agrees that in the performance of Associate's duties to the Company while employed by the Company, Associate will be brought into contact with Clients and Prospects of the Company. Associate acknowledges and agrees that any relationships with Clients and Prospects are those of the Company and that Associate has no ownership rights in such relationships. Associate also agrees that Confidential Information as defined below, gained by Associate during Associate's association with the Company, has been developed by the Company through substantial expenditures of time, effort and money and constitutes valuable and unique property of the Company. Associate further understands and agrees that the foregoing makes it necessary for the protection of the Company's Business that Associate not compete with the Company during Associate's employment with the Company and to prohibit certain types of interference with the Company for a reasonable period thereafter, as further provided in the following sections.

   b. Covenants.

      i. Covenants During Employment. While employed by the Company, Associate will not compete with the Company anywhere in the world. In accordance with this restriction, but without limiting its terms, while employed by the Company, Associate will not:

         (1) enter into or engage in any business which competes with the Company's Business;

         (2) solicit Clients, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Company's Business;

         (3) divert, entice or otherwise take away, and/or do business with, any Clients, business, patronage or orders of the Company or attempt to do so; or

         (4) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business.



      ii.  <u>Covenants Following Termination</u>.  During the Protected Period (as defined below), Associate will not:

          (1) call on, contact, solicit, and/or do business with, Clients or Prospects of the Company within the scope of the Company's Business; or

          (2) call on, contact, divert, entice or otherwise take away or interfere with any Prospects, Clients, business, patronage or orders of the Company related to the Company's Business, or attempt to do so.

2.  <u>Indirect Competition</u>.

    a.  For the purposes of subsection 1b. or section 4, but without limitation thereof, Associate will be in violation thereof if Associate engages in any or all of the activities set forth therein directly as an individual on Associate's own account, or indirectly as a partner, joint venturer, owner, manager, employee, agent, salesperson, consultant, officer and/or director of any firm, association, partnership, corporation or other entity, or as a stockholder of any corporation in which Associate or Associate's spouse, child or parent owns, directly or indirectly, individually or in the aggregate, more than five percent (5%) of the outstanding stock.

    b.  Associate understands and agrees that there are many different ways to violate this Agreement, each of which could cause irreparable harm to the Company.  The parties therefore agree that there is no adequate remedy at law if Associate violates this Agreement.  However, in the event that Associate, individually or acting on behalf of any business or entity with whom Associate works either as an employee or otherwise, actually writes business for any Client or Prospect of the Company after Associate leaves the Company and during the Protected Period, whether or not the Company has obtained or has attempted to obtain equitable relief, the Company, at its election, may deem that the Associate (and/or a subsequent employer or entity by which the Associate is engaged) has elected to purchase from the Company the business with respect to such Client or Prospect, and upon written demand, Associate shall pay to the Company an amount equal to two (2) times the gross revenue received by the Company for the twelve (12) month period preceding the date the business is obtained by the other entity, or two (2) times the expected gross revenue for any Prospect, as the Company reasonably determines.  The parties agree this will be a reasonable estimation of damages which the Company may invoke if Associate, individually or acting on behalf of any business or entity with whom Associate works either as an employee or otherwise during the Protected Period, actually writes business for a Company Client or Prospect.  All remedies contained in this Agreement are cumulative and may be exercised singularly or concurrently, and the exercise of any one shall not be deemed a waiver of any other.

    c.  During the Protected Period, Associate will not solicit or hire any employee who worked for the Company during the preceding six (6) months and will not directly or indirectly, attempt to disrupt, damage, impair or interfere with the Company's Business by raiding any of the Company's Associates, employees, or independent contractors



engaged in the Company's Business or soliciting any of them to resign from their association with or employment by the Company.

3. <u>The Company</u>. For purposes of this Agreement, the term "**Company**" shall include any and all direct and indirect subsidiaries, Parents, affiliates, and related companies of the Company involved in the Company's Business, including without limitation Alera Group, Inc.

4. <u>Confidentiality</u>. Associate will keep in strict confidence, and will not, directly or indirectly, at any time, during or after Associate's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Associate's duties of employment, use any Confidential Information, without limitation as to when or how Associate may have acquired such information. Further, Associate agrees to furnish, unless prohibited by law, prompt notice to the Company of any required disclosure of Confidential Information sought pursuant to subpoena, court order or any other legal process or requirement, and agrees to provide the Company a reasonable opportunity to seek protection of the Confidential Information prior to any such disclosure. Associate specifically acknowledges that all such Confidential Information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Associate and whether compiled by the Company or its subsidiaries, and/or Associate, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by Associate during Associate's employment with the Company (except in the course of performing Associate's duties and obligations to the Company) or after the termination of Associate's employment shall constitute a misappropriation of the Company's Trade Secrets. Associate acknowledges and understands that: (i) Associate shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret (as defined below) that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; (ii) Associate shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (iii) if Associate files a lawsuit for retaliation for reporting a suspected violation of law, Associate may disclose the Trade Secret to his or her attorney and use the Trade Secret information in the court proceeding, provided Associate files any document containing the Trade Secret under seal and does not disclose the Trade Secret, except pursuant to court order. Notwithstanding this immunity from liability, Associate understands that Associate may be held liable if Associate unlawfully accesses Trade Secrets by unauthorized means. Further, Associate understands that, notwithstanding the forgoing, this Agreement does not limit his or her ability to communicate with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission, any agency Inspector General or any other federal, state or local governmental agency or commission ("**Government Agencies**"), including to report possible violations of federal law or regulation or making other disclosures that are protected under the whistleblower provisions of federal law or regulation, or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company.



5. <u>Communication of Contents of Agreement</u>. While employed by the Company and during the Protected Period, Associate will communicate the contents of Agreement to any person, firm, association, partnership, corporation or other entity that Associate intends to be employed by, associated with, or represent. The Company in its discretion may similarly provide a copy of this Agreement to any person, business or enterprise that the Associate is employed by, associated with, or represents.

6. <u>Confidential Information Belonging to Third Parties</u>. Associate agrees that Associate shall not disclose to the Company or induce the Company to use any secret or confidential information belonging to Associate's former employers (except to the extent all right, title and interest to the same is otherwise acquired by the Company). Except as indicated, Associate warrants that Associate is not bound by the terms of a restrictive covenant agreement, non-solicitation agreement, confidentiality agreement or other agreement with a third party that would preclude or limit Associate's right to work for the Company and/or to disclose to the Company any ideas, inventions, discoveries, improvements or designs or other information that may be conceived during employment with the Company. Associate agrees to provide the Company with a copy of any and all agreements with a third party that preclude or limit Associate's right to make disclosures or to engage in any other activities contemplated by Associate's employment with the Company.

7. <u>Relief</u>. Associate acknowledges and agrees that the remedy at law available to the Company for breach of any of Associate's obligations under this Agreement would be inadequate. Associate therefore agrees that, in addition to any other rights or remedies that the Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this Agreement, without the necessity of proof of actual damage. Associate hereby agrees that in the event s/he breaches or fails to honor any term of this Agreement, and the Company is successful in whole or in part in any legal or equitable action to defend its rights under or to enforce any terms of this Agreement, Associate shall be required to reimburse the Company for all costs, expenses and reasonable attorneys' fees associated with such action. Associate understands and agrees that in the event he or she breaches any of the covenants contained herein during the Protected Period, the Protected Period shall be extended automatically. The duration of such extension shall equal the period of time between the date Associate began such violation and the date Associate permanently ceases such violation.

8. <u>Ownership and Work Product</u>.

   a. <u>Ownership of Records and Relationships</u>. Associate agrees that all papers, documents, records, and business accounts, generated by Associate during the conduct of such business or given to Associate during and in the course of Associate's employment with the Company is the exclusive property of the Company and shall remain with the Company upon Associate's termination. In addition, Associate acknowledges and agrees that any relationships with Clients and Prospects are those of the Company and that Associate has no ownership rights in such relationships.

   b. <u>Intellectual Property</u>. Associate further agrees to assign without further consideration all intellectual property, including but not limited to inventions, discoveries or any



material produced by Associate during the course of Associate's employment hereunder (including modifications or refinements of such materials) to the Company in their entirety. Associate shall execute all assignments and other documents necessary to effect such assignment. Such assignment and transfer is a complete and total assignment and transfer of any right Associate may have in such intellectual property and includes any patent, copyright, trade or service mark or the right to obtain any such patent, copyright, trade or service mark, and any trade secret rights in such material. This provision does not entitle Associate to any additional compensation, with any such additional compensation, if any, paid to Associate being within the sole discretion of Company. In the event the Company is unable, after reasonable effort, to secure Associate's signature on any letters patent, copyright or other analogous protection relating to intellectual property, whether because of Associate's physical or mental incapacity or for any other reason whatsoever, Associate hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as his or her agent and attorney-in-fact, to act for and in Associate's behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts and to further the prosecution and insurance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by Associate. Notwithstanding the foregoing, this section does not apply to an invention (i) for which no equipment, supplies, facility, or trade secret information of the Company was used and (ii) which was developed entirely on the Associate's own time, unless (a) the invention relates to either the Company's business and/or the Company's actual or demonstrable anticipated research or development or (b) the invention results from any work performed by the Associate for the Company.

    c.   <u>State Disclosures</u>. Employees working in Illinois, Kansas, Minnesota or Washington State are directed to the disclosures set forth on the last page.

9. <u>Reasonableness</u>. Associate acknowledges that Associate's obligations under this Agreement are reasonable in the context of the nature of the Company's Business and the competitive injuries likely to be sustained by the Company if Associate were to violate such obligations. Associate further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of the Company to perform its obligations under this Agreement and by other consideration (including access to Confidential Information), which Associate acknowledges constitutes good, valuable and sufficient consideration.

10. <u>Successors and Assigns</u>. The Company shall have the right to assign, without Associate's express consent, this Agreement to any person, including its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said person. Associate may not assign this Agreement in whole or in part without the prior written consent of the Company.

11. <u>Survival/Changes in Role or Title</u>. Associate acknowledges that his/her covenants in this Agreement are given in exchange for, among other things, his/her employment and the terms and conditions of such employment. Associate's covenants are not tied to his/her present role, title or responsibilities. Therefore, the covenants in this Agreement shall survive any change in Associate's role, title, responsibilities, compensation, benefits, or any other term or condition of Associate's employment.



12. <u>Governing Law/Venue/Jurisdiction/Jury Waiver</u>. The validity, interpretation and performance of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to conflict of law principles. Both parties agree that any action, demand, claim or counterclaim relating to the terms and provisions of this Agreement or to its breach, shall be commenced only and exclusively in the State of Illinois in a court of competent jurisdiction, and Associate hereby consents to personal jurisdiction and venue in such court(s). Both parties further agree that any such dispute shall be tried by a judge alone, and both parties hereby waive and forever renounce the right to a trial before a civil jury in any such dispute.

13. <u>Severability</u>. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

14. <u>Definitions</u>.

    a.  "<u>Client</u>" means any person, or group of persons, (i) to whom the Associate sold or provided Company products or services at any time within the twelve (12) months preceding the date on which Associate is no longer employed by the Company; (ii) to whom an employee of the Company who the Associate was responsible for managing or supervising, sold or provided Company products or services to at any time within the twelve (12) months preceding the date on which Associate is no longer employed by the Company; or (iii) about whom Associate obtained Confidential Information as a result of Company providing products and services to such person as part of the Company's Business within the twelve (12) months preceding the date on which Associate is no longer employed by the Company.

    b.  "<u>Company's Business</u>" means all aspects of the Company's insurance business, investment business, consulting and/or human resources services business, and any other business in which the Company is currently or may in the future become involved.

    c.  "<u>Confidential Information</u>" shall include, without limitation, any Trade Secrets or confidential business and technical information of the Company or its Clients or vendors known to Associate as a result of employment with the Company, the Company's operations, know-how, finances, business plans, processes, procedures, unique selling and servicing methods, offerings and business techniques, marketing techniques, training, service and business manuals, promotional materials, vendor and product information, lists and contacts with insurance companies, agents and adjusters, product pricing, Client and Prospect lists, other Client and Prospect information and other business information known to Associate as a result of employment with the Company.



d. "Parent" means any direct or indirect owner of 50% or more of the stock or other ownership interests in the Company.

e. "Prospect" means any person or entity (i) who has been identified with reasonable particularity by the Company in its business records within the twelve (12) months preceding the date on which Associate is no longer employed by the Company, as a possible client of the Company; and (ii) with whom the Associate had an in-person meeting or with whom the Associate directed a subordinate to conduct an in-person meeting for the purpose of providing services, or offering to provide services that the Company provides in the course of its business or to whom the Company provided a written proposal with which Associate was involved or to which Associate contributed, for the purpose of offering to provide services that the Company provides in the course of its business.

f. "Protected Period" means the two (2) year period following termination of employment for any reason.

g. The term "Trade Secrets" shall be given its broadest possible interpretation under the Defend Trade Secrets Act of 2016, and shall include (without limitation) all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, that is compiled, or memorialized physically, electronically, graphically, photographically, or in writing by the Company.

Banasky, an Alera Insurance Agency, LLC

_____
Jordan Houghton

_____
Date
7/30/20

_____
William L. Doucette, VP Human Resources
and Organizational Development

08/01/2020

_____
Date



## INTELLECTUAL PROPERTY ASSIGNMENT DISCLOSURES

**For Employees in Illinois:**

Pursuant to 765 Ill. Comp. Stat. 1060/2(3), this Agreement does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the Company was used, and which was developed entirely on Employee's own time, unless the invention relates to the business of the Company or actual or demonstrably anticipated research or development, or the invention results from any work the Employee performs for the Company.

**For Employees in Kansas:**

Pursuant to Kan. Stat. Ann. § 44-130(d), this Agreement does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the Company was used, and which was developed entirely on Employee's own time, unless the invention relates to the business of the Company or actual or demonstrably anticipated research or development, or the invention results from any work the Employee performs for the Company.

**For Employees in Minnesota:**

Pursuant to Minn. Stat. § 181-73(3), this Agreement does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the Company was used, which was developed entirely on Employee's own time, and which does not relate directly to the business of the Company or actual or demonstrably anticipated research or development or which does not result from any work Employee performs for the Company.

**For Employees in Washington State:**

Pursuant to Wash. Rev. Code § 1849.44.140(3), this Agreement does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the Company was used, which was developed entirely on Employee's own time, and which does not relate directly to the business of the Company or actual or demonstrably anticipated research or development or which does not result from any work Employee performs for the Company.