# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALERA GROUP, INC. | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| BROOKS HOUGHTON and | ) | |
| JORDAN HOUGHTON, individuals, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Alera Group, Inc. ("Alera" or the "Company"), by and through its attorneys, K&L Gates LLP, brings this Complaint for breach of contract, tortious interference with business relations, and injunctive relief (the "Complaint") against Defendants Brooks Houghton ("Brooks") and Jordan Houghton ("Jordan") (individually, each a "Defendant" and collectively "Defendants"), stating as follows:

## INTRODUCTION

1. Plaintiff Alera is one of the largest property and casualty and employee benefits insurance brokers in the United States, and is headquartered in Deerfield, Illinois.

2. Alera serves thousands of clients nationally in employee benefits, property and casualty, retirement services, and wealth management. Alera's mission is to create an unrivaled client experience by providing best practices, thought leadership, and smarter strategies, fueled by fierce national collaboration and trusted local delivery.

3.     Defendant Brooks operated his own insurance business under the name Strategic Insurance Agency, LLC ("Strategic") until August 2017.  Defendant Jordan, Brooks' brother, also worked at Strategic with Brooks as an insurance agent.

4.     On or about August 8, 2017, Brooks sold the assets of Strategic to Banasky Insurance, Inc. ("Banasky")

5.     Brooks received significant consideration for the sale of the assets of Strategic.  In return, and as part of the consideration for that sale, Brooks agreed to a two-year restrictive covenant, prohibiting Brooks from engaging in a competitive business with Banasky and from using or disclosing Banasky's confidential information.

6.     Simultaneously with the sale of Strategic, Brooks entered into an employment agreement with Banasky on September 1, 2017 (the "Brooks Employment Agreement").  A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

7.     As a condition of his employment with Banasky, and as set forth in the Brooks Employment Agreement, Brooks agreed to certain restrictive covenants.  Specifically, the Employment Agreement included provisions addressing confidentiality and nondisclosure as well as noncompetition with Banasky.

8.     Upon the sale of Strategic to Banasky, Jordan also became an employee of Banasky.

9.     On August 1, 2020, Alera acquired Banasky in an asset purchase transaction.

10.     In connection with the sale of Banasky to Alera, a new corporate entity named "Banasky, an Alera Insurance Agency, LLC" was created.  Banasky, an Alera Insurance Agency, LLC is a Delaware limited liability corporation.  Plaintiff Alera is the sole member of Banasky, an Alera Insurance Agency, LLC.

11.     After the sale of Banasky to Alera, Brooks and Jordan became employees of Banasky, an Alera Insurance Agency, LLC.

12.     As a condition of employment with Banasky, an Alera Insurance Agency, LLC, both Brooks and Jordan each executed a Producer Agreement (the "Producer Agreement") and a Restrictive Covenant Agreement (the "Restrictive Covenant Agreement").   True and correct copies of these agreements are contained in Exhibit B to this Complaint (Brooks Producer Agreement) and Exhibit 1 to Exhibit B (Brooks Restrictive Covenant Agreement) and Exhibit C (Jordan Producer Agreement) and Exhibit 1 to Exhibit C (Jordan Restrictive Covenant Agreement).

13.     Alera is a party to the Brooks Producer Agreement, the Brooks Restrictive Covenant Agreement, the Jordan Producer Agreement, and the Jordan Restrictive Covenant Agreement.

14.     As part of these Agreements, Brooks and Jordan promised that during their Alera employment, they would not compete with Alera, solicit customers for any business that competes with Alera, divert or take away any customers of business of Alera, and promote or assist any competitor of Alera.  (Ex. 1 to Ex. B, § 1(b)(i); Ex. 1 to Ex. C, § 1(b)(i)).

15.     Brooks' employment with Alera ended on May 27, 2021.

16.     Defendant Brooks held a position of trust with Alera.  Most recently, Brooks worked as a Producer, responsible for client relations, services, sales and marketing, and maintenance of client relationships with valued customers.   In this position, Brooks was responsible for knowing, amassing, and safeguarding detailed and sensitive information about company operations, policies, procedures, and performance in the marketplace.

17.     As part of the various agreements he entered into, specifically the Employment Agreement, the Producer Agreement, and the Restrictive Covenant Agreement, Brooks agreed to refrain from competing with Alera as well as soliciting, diverting, enticing, or otherwise interfering with any clients, customers, business, patronage or orders related to Banasky.

18.     Following the termination of his employment with Banasky and Alera, and while he is still obligated to comply with his obligations under the Producer Agreement and Restrictive Covenant Agreement, Brooks has, on information and belief actively misled Alera's clients as to the existence and scope of his obligations, and solicited and targeted current Alera clients to interfere with their contractual relationship with Alera, in direct violation of his contractual obligations.

19.     Upon information and belief, and based on the specific facts alleged below, Brooks continues to unfairly solicit and poach current Alera clients in violation of his contractual obligations.

20.     Jordan's employment with Alera ended on or about December 23, 2022.

21.     Defendant Jordan also held a position of trust with Alera.  Most recently, Jordan worked as a Producer, responsible for client relations, services, sales and marketing, and maintenance of client relationships valued customers.  In this position, Jordan was responsible for knowing, amassing, and safeguarding detailed and sensitive information about company operations, policies, procedures, and performance in the marketplace.

22.     Pursuant to the Producer Agreement, and the Restrictive Covenant Agreement, Jordan agreed to refrain from competing with Alera as well as soliciting, diverting, enticing, or otherwise interfering with any clients, customers, business, patronage or orders.

23.     Following the termination of his employment with Alera, and while he is still obligated to comply with his obligations under the Producer Agreement and Restrictive Covenant Agreement, Jordan has solicited and targeted current Alera clients to interfere with their contractual relationship with Alera, in direct violation of his contractual obligations.

24.     Alera made written demands to Brooks and Jordan to cease violating their contractual obligations to Alera.  Brooks and Jordan have ignored those written demands and continue to violate their respective Producer Agreements and Restrictive Covenant Agreements.

25.     Alera is suffering, and will continue to suffer, irreparable harm in terms of lost client relationships and goodwill from Brooks' and Jordan's ongoing violations of their contractual obligations.

26.     Alera has suffered substantial damages from Brooks' and Jordan's past material breaches of their respective contractual obligations.

27.     By this action, Alera seeks to restrain and enjoin both Brooks and Jordan from engaging in activities in further breach of their contractual obligations, to recover damages suffered as a result of Brooks' and Jordan's wrongful acts.

## PARTIES AND CITIZENSHIP

28.     Plaintiff Alera is incorporated in Delaware, and is registered with the Illinois Secretary of State as a foreign corporation.  Alera is therefore a citizen of the State of Delaware.

29.     Alera's corporate headquarters are located in Deerfield, Illinois.  Alera is therefore also a citizen of the State of Illinois.

30.     Brooks was domiciled in the State of Utah during the period relevant to this lawsuit. On information and belief, Brooks Houghton's domicile is 807 E. Pacific Drive, American Fork, Utah 84003.  Brooks is therefore a citizen of Utah because he is domiciled in Utah.

5

31.     Defendant Jordan was domiciled in Utah during the period relevant to this lawsuit. On information and belief, Defendant Jordan Houghton's domicile is 1799 S 250 W, Lehi, Utah 84043.  Brooks is therefore a citizen of Utah because he is domiciled in Utah.

## AMOUNT IN CONTROVERSY

32.     Brooks' clients generated an annual revenue to Alera in excess of $2 million.

33.     Jordan's clients generated an annual revenue to Alera in excess of $3 million.

34.     Alera seeks injunctive relief to protect the client relationships and associated goodwill for the clients that Brooks and Jordan worked with and serviced, as well as damages for the former Alera clients already lost due to Brooks' and Jordan's violations of their Restrictive Covenant Agreements.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because (a) Plaintiff Alera is a citizen of Delaware and Illinois and Defendants are both citizens of Utah, so Plaintiff and the Defendants are citizens of different States, and (b) the matter in controversy exceeds $75,000, as alleged in Paragraphs 32 through 35.

36.     Brooks and Joran both "consent[ed] to personal jurisdiction" in any "court of competent jurisdiction … in the State of Illinois."  Ex. B, Section 15, and Ex. 1 to Ex. B, Section 12 and Ex. C, Section 15, and Ex. 1 to Ex. C, Section 12 ("Both parties agree that any action, demand, claim or counterclaim relating to the terms and provisions of this Agreement or to its breach, shall be commenced only and exclusively in the State of Illinois in a court of competent jurisdiction, and Associate hereby consents to personal jurisdiction and venue in such court(s).").

37.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Brooks and Jordan agreed that any action relating to the terms of their respective Producer Agreements and

Restrictive Covenant Agreements "shall be commenced only and exclusively in the State of Illinois in a court of competent jurisdiction," and Brooks and Jordan "consent[ed] to … venue in such court(s)." Ex. B, Section 15, and Ex. 1 to Ex. B, Section 12 and Ex. C, Section 15, and Ex. 1 to Ex. C, Section 12.

**FACTS**

**A.      Alera's Business.**

38.      Alera is an independent national insurance and financial services firm that assists businesses with various insurance products and financial services, including but not limited to, employee benefits and wealth management.

39.      Alera was established in 2017 through a merger of 24 companies, working together to leverage powerful relationships, industry expertise, and resources with the goal of elevating client satisfaction while comprehensively fulfilling client needs.  Today, Alera has more than 125 companies across the country, including Banasky, an Alera Insurance Agency, LLC, with its headquarters and central operations located in Deerfield, Illinois.

40.      Through the merger, Alera developed unique, specialized, innovative, and strategic ways of packaging its insurance products and structuring its services to meet its clients' needs, which affords the opportunity to provide a national scope of services while maintaining local relationships.  Alera, and its subsidiary companies prior to acquisition by Alera, have made a concerted effort to keep all such customer and strategic information confidential.  Alera, and its subsidiary companies prior to acquisition by Alera, provide customer information only to those employees who need to know such information to perform their job duties.  The information is also the subject of reasonable efforts to maintain and preserve its confidentiality and secrecy including but not limited to: limiting access to employees on a need to know basis, requiring

7

employees to execute confidentiality agreements and restrictive covenants, maintaining the information in secure offices and facilities, password protecting computer databases, and similar security measures.

41.     In order to effectively market Alera's and its subsidiary companies' products and services to existing and prospective clients, Producers such as Defendants are provided with and otherwise have access to protected, highly confidential information relating to Alera's offerings, including data as to the structure of its services, pricing, benefit plan design strategies, marketing plans, customer information, and other information critical to Alera's competitive advantage.

**B.     Alera's Relationship with Brooks.**

42.     Defendant Brooks operated his own insurance business, Strategic, until August 8, 2017.  On August 8, 2017, Brooks sold the assets of Strategic to Banasky.

43.     Brooks was hired by Banasky on August 8, 2017, concurrent with the acquisition of Strategic by Banasky.  Brooks received significant consideration for the sale of the assets of Strategic and in return agreed to various restrictive covenants, prohibiting Brooks from competing with Banasky for a period of two years in addition to restrictions related to customer non-solicitation, non-interference, and nondisclosure and non-use of Banasky's Confidential Information.

44.     Simultaneously with the sale of the Strategic, Brooks entered into the Employment Agreement with Banasky on September 1, 2017.

45.     As a condition of employment and as set forth in the Employment Agreement, Brooks agreed to certain restrictive covenants, addressing confidentiality and nondisclosure as well as noncompetition and non-solicitation for a three (3) year period following the termination of his employment with Banasky.

46. On August 1, 2020, Banasky was acquired in an asset purchase by Alera, thereby joining the Alera corporate family. In connection with the sale to Alera, Banasky and Brooks mutually entered into the Payoff Agreement settling all of the outstanding balance Banasky owed Brooks under the Purchase Agreement.

47. Also in connection with the sale of Banasky to Alera, Brooks also entered into the Producer Agreement and the Restrictive Covenant Agreement to which Alera is a party.

48. Simultaneously, Jordan also entered into an identical Producer Agreement and Restrictive Covenant Agreement to which Alera is a party.

49. Section 10 of the Producer Agreement states that each Defendant "will execute and agrees to abide by the terms of the restrictive covenant agreement." Ex B, Section 10; Ex C, Section 10.

50. The Producer Agreement further provides the following:

> Purchase of Business. The Company and Associate agree that there are many different ways to violate the Restrictive Covenant Agreement contemplated under the terms of the Restrictive Covenant Agreement, each of which could cause irreparable harm to the Company. The parties specifically agree that any post-employment or post-engagement contact Associate makes to the Company's customers or prospects (as defined in the Restrictive Covenant Agreement) will cause injury to the Company even if the contact does not immediately or directly result in Associate writing business for a Company customer or prospect. The parties therefore agree that there is no adequate remedy at law if Associate violates the terms of the Restrictive Covenant Agreement. However, in the event that Associate or any business or entity with whom Associate works either as an employee or otherwise actually writes business for any customer or Prospect (as defined in the Restrictive Covenant Agreement) of the Company after Associate leaves the Company and during the Protected Period (as defined in the Restrictive Covenant Agreement), whether or not the Company has obtained or has attempted to obtain equitable relief, the Company, at its election, may deem that Associate has elected to purchase from the Company the business with respect to such customer or Prospect, and upon written demand, Associate shall pay to the Company an amount

9

equal to two (2) times the gross revenue received by the Company (including any predecessor) for the preceding twelve (12) months with respect to any business customer purchases in connection with the business services Associate renders, or two (2) times the expected gross revenue for any Prospect. The parties intend this provision to be a reasonable estimation of damages which the Company may invoke if Associate or any business or entity with whom Associate works either as an employee or otherwise during the Protected Period actually writes business for a Company customer or prospect. All remedies contained in this Agreement and the Restrictive Covenant Agreement are cumulative and may be exercised singularly or concurrently, and the exercise of any one shall not be deemed a waiver of any other. (Ex. B, § 11; Ex. C, § 11).

51.     Section 1(b)(i) of the Restrictive Covenant Agreement states that

While employed or engaged by the Company, [Defendant] will not compete with the Company anywhere in the world.  In accordance with this restriction, but without limiting its terms, while employed or engaged by the Company, [Defendant will not: (1) enter into or engage in any business which competes with the Company's Business; (2) solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Company's Business; (3) divert, entice, or otherwise take away, and/or do business with, any customers, business, patronage or orders of the Company or attempt to do so; or (4) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business." (Ex. 1 to Ex. B, § 1(b)(i); Ex. 1 to Ex. C, § 1(b)(i)).

52.     Section 1(b)(ii) of the Restrictive Covenant Agreement prohibits each Defendant from soliciting and/or doing business with any Alera "Client" for two years after the termination of their employment (the "Restricted Period").  (Ex. 1 to Ex. B, § 1(b)(ii); Ex. 1 to Ex. C § 1(b)(ii)).

53.     Section 14(a) of the Restrictive Covenant Agreements defines "Client," and limits "Client" to those that Brooks and Jordan, respectively (i) provided company products or services to during the twelve months preceding the end of their employment, (ii) were responsible for manager or supervising or sold company products or services during the twelve months preceding

the end of their employment, and/or (iii) about whom they received confidential company information as a result of the company providing products or services within the twelve months preceding the end of their employment. (Ex. 1 to Ex. B, § 14(a); Ex. 1 to Ex. C § 14(a)).

54. The Restrictive Covenant Agreement further provides in relevant part:

> Further Covenants. Associate will keep in strict confidence, and will not, directly or indirectly, at any time, during or after Associate's employment or engagement with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Associate's duties of employment or engagement, use any Confidential Information (as defined below), without limitation as to when or how Associate may have acquired such information. Ex. 1 to Ex. B, § 5; Ex. 1 to Ex. C, § 5.

55. As Producers, Brooks and Jordan were responsible for developing new clients from referrals, making outbound calls and networking; creating insurance proposals tailored to fit a client's unique needs by appropriately determining carrier placement as well as coverages; and on-boarding clients by providing a thorough introduction to policy service resources. Each of Brooks and Jordan were also responsible for retaining existing clients in their assigned book of accounts.

56. As part of those responsibilities, Brooks and Jordan had (and were required to have in order to perform their jobs) unrestricted access to certain confidential and proprietary information, including, but not limited to, information concerning:

    a.  Sales strategies;

    b.  Client lists;

    c.  Renewal lists;

    d.  Advertising techniques;

    e.  Benefit plan design strategies;

    f.  Pricing information – both generally and for particular clients;

    g.  Contracts with insurance companies;

h. Renewal proposals;

i. Customer specific information such as payment histories, quotas, budgets and contact information;

j. Internal cost data;

k. Product and service lists for specific clients; and

l. Operational data for multiple accounts correlating with Alera's business strategy.

**C.    Brooks Materially Breaches his Producer Agreement and Restrictive Covenant Agreement**

57.    Following the termination of his employment with Alera, Brooks began communicating with former clients in breach of the Employment Agreement, Producer Agreement, and the Restrictive Covenant Agreement.  Specifically, Brooks has successfully directed multiple clients to terminate their business with Alera and transfer their business to a competing insurance broker iDrive Insurance LLC ("iDrive").

58.    According to records available through the Utah Secretary of State's web site, iDrive's Registered Agent is Jamie D. Nielsen ("Nielsen").

59.    Upon information and belief, Nielsen managers and operates iDrive.

60.    Nielson was formerly employed by Strategic and worked with Brooks up until the sale of Strategic to Banasky.

61.    Upon information and belief, Brooks continues to be a close associate of Nielsen, and is soliciting his former Alera clients away to iDrive.

62.    Upon information and belief, Brooks and Nielson operate a payroll company in Utah, American Benefits of Utah, Inc. ("American Benefits").

63.     Upon information and belief, Brooks used his operation of American Benefits to solicit Alera clients to terminate their relationship with Alera and transfer their business to iDrive.

64.     During the Restricted Period, two major insurance carriers verbally notified Alera that Brooks contacted them on behalf of iDrive to generate business for iDrive.

65.     During the Restricted Period, one of Alera's former clients to which Brooks provided Alera products and services, and a client for which Brooks was responsible for managing Alera's relationship within the twelve months before the end of his Alera employment, and a client for which Brooks was responsible for managing Alera's relationship within the twelve months before the end of his Alera employment -- "Client A" -- (a) transferred its business from Alera to iDrive, and (b) verbally informed Alera that Brooks issued an insurance policy to it through iDrive. Brooks' conduct with regard to Client A violates his Restrictive Covenant Agreement.

66.     During the Restricted Period, another one of one of Alera's former clients to which Brooks provided Alera products and services, and a client for which Brooks was responsible for managing Alera's relationship within the twelve months before the end of his Alera employment, and a client for which Brooks was responsible for managing Alera's relationship within the twelve months before the end of his Alera employment -- "Client B" -- (a) transferred its business from Alera to iDrive, and (b) confirmed to Alera in writing that it "decided to use Brooks for the coming year." Brooks' conduct with regard to Client B violates his Restrictive Covenant Agreement.

67.     During the Restricted period, another of Alera's former clients to which Brooks provided Alera products and services, and a client for which Brooks was responsible for managing Alera's relationship within the twelve months before the end of his Alera employment, and a client for which Brooks was responsible for managing Alera's relationship within the twelve months before the end of his Alera employment -- "Client C" -- (a) transferred its business from Alera to

iDrive, and (b) inadvertently sent an email to Brooks' former Alera email account, the substance of which indicates that Brooks is performing insurance work for Client C.  Brooks' conduct with regard to Client C violates his Restrictive Covenant Agreement.

68.     During the Restricted period, another of Alera's former clients to which Brooks provided Alera products and services within the twelve months before the end of his Alera employment, and a client for which Brooks was responsible for managing Alera's relationship within the twelve months before the end of his Alera employment -- "Client D" -- (a) transferred its business from Alera to iDrive, and (b) inadvertently sent an email to Brooks' former Alera email account, the substance of which indicates that Brooks is performing insurance work for Client D.  Brooks' conduct with regard to Client D violates his Restrictive Covenant Agreement.

69.     During the Restricted Period, numerous other former Alera clients to which Brooks provided Alera products and services, and for which Brooks was responsible for managing Alera's relationship within the twelve months before the end of his Alera employment, terminated their relationships with Alera and transferred their business to iDrive.  On information and belief, and based on Brooks' conduct regarding Clients A, B, C. and D as alleged above, Brooks violated his Restrictive Covenant Agreement with regard to these other former Alera clients.

70.     In an effort to stop Brooks' conduct short of litigation, in both September and November 2022, Alera sent Brooks a letter demanding that Brooks immediately cease his solicitation of Alera clients.

71.     Despite being warned to cease his active solicitation of Alera clients in violation of his post-employment obligations, Brooks continued to solicit Alera clients he managed and serviced during the last twelve months of his employment.

72.     As of the date of this Complaint, over fifteen of Alera clients Brooks managed and serviced in the twelve months before the end of his Alera employment have left Alera and transferred their business to iDrive.  In total those clients generated annual revenues for Alera in excess of $200,000.

**D.     Jordan Materially Breaches his Producer Agreement and Restrictive Covenant Agreement**

73.     After Jordan's employment with Banasky, an Alera Insurance Agency, LLC, ended, Jordan became affiliated with iDrive, as evidenced by "Active Agency Affiliations information available on the website of the Utah Insurance Department:



| Active Agency Affiliations | | | | | |
|---|---|---|---|---|---|
| Agency | City | State | License Number | Active Date | Status |
| IDRIVE INS | SPANISH FORK | UT | 597292 | Jan 13,2023 | Active |
| IDRIVE INS | SPANISH FORK | UT | 597292 | Jan 13,2023 | Active |
| IDRIVE INS | SPANISH FORK | UT | 597292 | Jan 13,2023 | Active |
| IDRIVE INS | SPANISH FORK | UT | 597292 | Jan 13,2023 | Active |

74. On or about January 24, 2023, Alera received notification that a client Jordan managed and serviced during the last twelve months of his Alera employment was terminating its relationship with Alera and transferring its business to iDrive, naming Jordan as its new agent of record at iDrive:



75. On or about January 25, 2023, another client for which client Jordan managed and serviced during the last twelve months of his employment verbally notified Alera that it was moving all of its business to Jordan at iDrive.

76. On or about January 26, 2023, Alera received notification that another client Jordan managed and serviced during the last twelve months of his employment was terminating its relationship with Alera and transferring its business to iDrive, naming Jordan as its new agent of record:

16

> Please be advised that we wish to name _Jordan Houghton_
> _____ as our exclusive representative effective _1-26-23_
>            CODE #                                                    DATE
> for the lines of business shown above, currently in force or submitted by application.
>
> This authorization replaces any other authorization that may have been previously completed for any other insurance representative for the stated lines of business.

77.     January 27, 2023, Alera received notification that another client Jordan managed and serviced during the last twelve months of his employment was terminating its relationship with Alera and transferring its business to iDrive, naming Jordan as its new agent of record:



> Please be advised that we wish to name _Jordan Houghton_
> _____ as our exclusive representative effective _1-27-23_
>            CODE #                                                    DATE
> for the lines of business shown above, currently in force or submitted by application.
>
> This authorization replaces any other authorization that may have been previously completed for any other insurance representative for the stated lines of business.

78.     Despite being warned via correspondence from Alera to cease his active solicitation of Alera clients in violation of his post-employment obligations, Jordan continued to solicit Alera clients he managed and serviced during the last twelve months of his employment.

79.     Jordan's actions are causing and continuing to cause irreparable harm to Alera's goodwill in its business and with its clients.  As such, Alera is without an adequate remedy at law.

## COUNT I

### BREACH OF THE PRODUCER AGREEMENT AND THE RESTRICTIVE COVENANT AGREEMENT (AGAINST DEFENDANT BROOKS)

80. Paragraphs 1 through 79 of the Complaint are hereby incorporated by reference as though set forth in full.

81. The Restrictive Covenant Agreement contained in Brooks' Producer Agreement is valid, enforceable, and supported by adequate consideration.

82. Through his Producer Agreement, Brooks agreed to abide by the terms of the Restrictive Covenant Agreement. Brooks was aware of his post-employment obligations upon signing the Restrictive Covenant Agreement.

83. Alera has protectable interests in its confidential information and its customer relationships.

84. Alera has fully performed all obligations to Brooks under both the Producer Agreement and Restrictive Covenant Agreement.

85. Brooks has breached his Producer Agreement and Restrictive Covenant Agreement by soliciting and diverting away clients he managed and serviced during the last twelve months of his employment.

86. As a direct and proximate result of Brooks' past breaches of the Producer Agreement, and the Restrictive Covenant Agreement, Alera has suffered lost revenue in excess of $230,000.

**COUNT II**

**BREACH OF THE PRODUCER AGREEMENT AND THE RESTRICTIVE
COVENANT AGREEMENT (AGAINST DEFENDANT JORDAN)**

87.  Paragraphs 1 through 79 of the Complaint are hereby incorporated by reference as though set forth in full.

88.  The Restrictive Covenant Agreement contained in the Producer Agreement is valid, enforceable, and supported by adequate consideration.

89.  Through the Producer Agreement, Jordan agreed to abide by the terms of the Restrictive Covenant Agreement. Jordan was aware of his post-employment obligations upon signing the Restrictive Covenant Agreement.

90.  Alera has protectable interests in its confidential information and customer relationships.

91.  Alera has fully performed all obligations to Jordan under both the Producer Agreement and Restrictive Covenant Agreement.

92.  Jordan has breached his Producer Agreement and Restrictive Covenant Agreement by soliciting and diverting away clients he managed and serviced during the last twelve months of his employment.

93.  As a direct and proximate result of Jordan's past breaches of the Producer Agreement, and the Restrictive Covenant Agreement, Alera has suffered lost revenue in excess of $100,000.

94.  Alera seeks injunctive relief against Jordan to halt his continued violations of his Producer Agreement and Restrictive Covenant Agreement.  The value of the business Alera seeks to protect exceeds $3 million.

19

95.     Alera's ongoing loss of client relationships and goodwill is causing Alera irreparable harm which cannot be remedied in money damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alera Group, Inc. respectfully requests that this Court issue a judgment in its favor and against Brooks Houghton and Jordan Houghton, and enter an order:

(i)     Enjoining Defendants from violating the client solicitation restrictions contained in their Restrictive Covenant Agreements;

(ii)    Directing Defendants to abide by the terms of their Producer Agreements and Restrictive Covenant Agreements;

(iv)    Directing Defendants to return to Alera any and all confidential or trade secret information, knowledge, or data obtained from Alera or Banasky;

(v)     Directing Defendants to provide an accounting of all sums earned by Defendants from the actions described in the Complaint;

(vi)    Awarding to Alera any and all monetary damages sustained as a result of Defendants' past contractual violations, and sums owed under their respective Producer Agreements and Restrictive Covenant Agreements;

(vii)   Awarding to Alera the cost of the suit, including attorneys' fees pursuant to Defendant's respective Producer agreements and Restrictive Covenant Agreements; and

(viii)  Such other relief as the Court deems to be fair and appropriate.

Respectfully submitted,
ALERA GROUP, INC.
Plaintiff

Date: February 22, 2023

By: */s/ Brian E. Spang*_____
One of its Attorneys

Brian E. Spang
Erinn L. Rigney
K&L Gates LLP
70 West Madison
Suite 3100
Chicago, IL 60602-1121
Phone: 312-781-6028
Fax: 312-827-805
brian.spang@klgates.com
erinn.rigney@klgates.com

*Attorneys for Plaintiff*